

1

2

3                                    UNITED STATES DISTRICT COURT

4                                         DISTRICT OF NEVADA

5                                               * * *

6    UNITED STATES OF AMERICA,              )
                                            )
7                        Plaintiff,         )
                                            )
8    v.                                     )         CR-S-02-083-RLH-LRL
                                            )         Motion to Suppress - #23
9    BECKHAM BAKER,                         )
                                            )
10                       Defendant.         )
                                            )
11   _____)

12                              **REPORT & RECOMMENDATION**

13           The defendant, Beckham Baker, is awaiting trial on charges of Receiving and Possessing

14   Child Pornography, in violation of 18 U.S.C. §§ 2252(a)(2) and 2252(a)(4)(B), respectively.

15   Both charges stem from a January 2, 2002 seizure of alleged pornographic materials from

16   Baker's home and computer pursuant to a federal search warrant issued on December 28, 2001.

17   Presently before the court is Baker's Motion to Suppress Physical Evidence (#23), in which he

18   contends that the affidavit in support of the search warrant was fatally defective. The court has

19   considered the motion; the government's Opposition (#24); Baker's Request for Briefing Time

20   to Supplement Defendant's Motion to Suppress (#25); Baker's Supplement (#27); the

21   government's Response to Defendant's Supplement (#29); Baker's Supplemental Brief in

22   Support of Franks Hearing (#32); the government's Response to Defendant's Second

23   Supplemental Motion to Suppress (#33); the arguments presented by counsel at the hearing on

24   November 12, 2002; the government's Memorandum in Support of *Franks* Hearing (#39); the

25   evidence adduced at the *Franks* hearing on April 8, 2003; Baker's Post Hearing Brief (#53); the

26   government's Post-Hearing Brief (#55); the government's Addendum to Post-Hearing Brief

84

1  (#56); the government's Second Addendum to Post-Hearing Brief (#58); the government's
2  Third Addendum to Post-Hearing Brief (#62); Baker's Supplemental Authorities (#63); Baker's
3  additional Supplemental Authorities (#66); and the government's Fourth Addendum to Post-
4  Hearing Brief (#83).   Based on the foregoing, the undersigned submits this Report and
5  Recommendation.

6                                    **BACKGROUND**

7          The affidavit in support of the December 28, 2001 search warrant was prepared by FBI
8  Special Agent Andrew Gruninger. Paragraphs 1 through 8 recount the investigative efforts of
9  then Special Agent Geoffrey Binney of the FBI's Houston Division.[1] Binney's investigation
10  focused on the nature of an online Egroup called "Candyman," and the activities of its members,
11  including one whose screen name was "carvaggio1@aol.com" (hereafter "carvaggio").
12  Paragraphs 9 through 13 recount the steps Gruninger took to confirm the name and address of
13  the person who joined the Candyman Egroup as carvaggio.   Baker does not challenge
14  Gruninger's conclusion that he was carvaggio, or that he resided at 4392 Paramount Street in
15  Las Vegas.   Rather, the focus of his attack is on the information supplied by former Agent
16  Binney.   Baker contends that Binney's information contained false statements made with
17  reckless disregard for the truth, without which probable cause would not have been shown.
18  Baker also contends that Binney's information was too stale to support a showing of probable
19  cause.

20  *1. The Affidavit*[2]

21          On January 2, 2001, Binney, acting in an undercover capacity, joined an Egroup called
22  "The Candyman." Binney remained a member of the Candyman Egroup until February 6, 2001,

23  _____

24          [1] Binney retired from the FBI and entered the private practice of law in August, 2002.

25          [2] What follows is the information provided by Agent Binney, which was incorporated into
   Gruninger's affidavit in paragraphs 1 through 8.  A copy of the affidavit is attached to Baker's motion (#23)
26  as Exhibit B.

                                        2

1  when Yahoo, the owner and operator of Egroups, shut the Candyman site down.  On the front

2  page of its website the Candyman Egroup billed itself as follows:

3          This group is for People who love kids.  You can post any type of
         messages you like too (sic) or any type of pics and vids you like too
4        (sic).  P.S. IF WE ALL WORK TOGETHER WE WILL HAVE
         THE BEST GROUP ON THE NET.
5

6  The affidavit goes on to state that in his undercover capacity, Binney learned that in order to

7  join the Candyman Egroup he simply had to e-mail the group moderator and request permission

8  to join, which he says he did.  Binney learned that new members were immediately added to the

9  e-mail list, and were able to post images or video files on the website that other members could

10 download.  At the bottom of each e-mail were directions on how to stop receiving e-mails from

11 the group and how to cancel one's membership in the group.  The affidavit further states:

12         Every e-mail sent to the group was distributed to every member
         automatically.   Therefore, when an individual uploaded and
13       transmitted child pornograph y to the Candyman group, those
         images were transmitted to every one of the group members.
14

15         The affidavit also states that Binney learned that the primary feature of the website was

16 the "Files" section, which allowed members to upload and download images directly to and

17 from the website.  In the four and a half week period while he was a member, Binney received

18 approximately 498 e-mails, attached to which were approximately 183 child erotica images and

19 105 child pornographic images.  On what was to be the last day on which the Candyman Egroup

20 was in operation, Binney received an e-mail containing two child pornographic images: one

21 image was that of a nude female, approximately ten years of age, performing oral sex on an

22 adult male; the other image was of the same child straddling an adult male while masturbating

23 him.

24         The affidavit adds that on February 9, 2001, in response to a grand jury subpoena, Yahoo

25 provided Binney with a list of 3,397 e-mail addresses of Candyman Egroup members as of

26 February 6, 2001.  One of those e-mail addresses was "carvaggio."  On April 10, 2001, America

Online, Inc. ("AOL") informed the FBI that the subscriber to the e-mail account identified as "carvaggio1@aol.com" was one Beckham Baker, who resided at 4392 Paramount Street in Las Vegas, Nevada. In addition to other identifying information, AOL provided other screen names used by Baker, including "BiggaDickaAlpha," "Mountingstick," "Lovesuckabiggy," "BeefHunLo," and "IsItTooBig4U." Finally, on August 31, 2001, Yahoo provided the FBI with subscription logs revealing that carvaggio joined the Candyman Egroup on January 14, 2001 and remained a member until February 6, 2001, the day Yahoo shut down the site. Yahoo also provided the FBI with all the Candyman Egroup e-mails received by carvaggio, and all the images, including numerous child erotica and child pornography images, posted to the Egroup site while carvaggio was a member. Yahoo was not able to determine which, if any, of those posted images carvaggio actually downloaded.

Follow-up investigation by Agent Gruninger revealed that Beckham Baker worked as a teacher's aide at a day care center for preschoolers in Las Vegas.

On the basis of the above-described affidavit, a search warrant for Baker's home and computer was issued on December 28, 2001. It was executed on January 2, 2002.

*2. Baker's Contention*

Baker contends that the following statements by former Agent Binney, which Baker maintains were essential to a showing of probable cause, were false, and were made with reckless disregard for the truth:

> Every e-mail sent to the group was distributed to every member automatically. Therefore, when an individual uploaded and transmitted child pornography to the Candyman group, those images were transmitted to every one of the group members.

Gruninger Affidavit, p.3, ¶3. In Baker's view, these representations were essential to a showing of probable cause because they constituted the only evidence that pornographic images were in fact transmitted to him. He maintains that members of the Candyman group were actually provided mail delivery options, one of which was the option not to receive e-mails. Hence,

4

1   Baker concludes, it was not true that pornographic images of children that were posted to the

2   Candyman site were automatically transmitted to every member of the group.

3          The government concedes that the above-quoted statements are not true, and were not

4   true when made, but strongly denies that Binney either knowingly or recklessly forwarded false

5   information to Agent Gruninger. The government contends that at the time the search warrant

6   application was made, Binney had a good faith belief that every e-mail sent to the Egroup was

7   distributed automatically to every member of the group. According to the government, Binney's

8   failure to discover the truth was innocent, or negligent at most, but clearly not the product of

9   reckless disregard for the truth.[3]

10         On July 11, 2002, the prosecutor assigned to this case, Assistant U.S. Attorney Nancy

11  Koppe, wrote to Baker's lawyer, Assistant Federal Public Defender Arthur Allen, informing

12  Allen that Binney's representation that "[e]very e-mail sent to the group was distributed to every

13  member automatically" was untrue.[4] In the letter Ms. Koppe stated:

14              I have learned that this statement was apparently not accurate in
                that three delivery options were available to all users/members.
15              These options included receiving all individual e-mails, a daily
                digest of e-mails and no e-mail receipt at all. If a member selected
16              the no e-mail option, e-mail messages posted to the Egroup ...,
                including messages from the Egroup moderator, would not be
17              forwarded to [Baker's] e-mail account.

18  In view of the obvious relevance of Binney's inaccurate representation, the government agreed

19  that an evidentiary hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), was

20  warranted. The key issue was whether Binney's inaccurate representation regarding the

21  distribution of e-mails was made with reckless disregard for the truth.

22  *3. The Franks Hearing*

23

24  ─────────────────────────

         [3]  Baker does not allege that Binney's false statements were made *deliberately*.
25
         [4]  Ms. Koppe's letter is attached to Baker's Request for Briefing Time to Supplement Defendant's
26  Motion to Suppress (#25) as Exhibit A.

1    The government called two witnesses: former Special Agent Binney and FBI Special

2  Agent Kristen Sheldon of the Houston Division. Binney testified that it was his recollection that

3  he joined the Candyman E-group by sending an e-mail to the "subscribe" address displayed on

4  the Candyman welcome page. He does not recall having seen a set of e-mail delivery options.

5  After he joined the Candyman E-group, he automatically began to receive individual e-mails

6  with attachments containing child erotica and child pornographic images.  He therefore

7  believed, based on his personal experience, that everyone who joined the E-group automatically

8  received the same individual e-mails. In response to a grand jury subpoena issued to Yahoo,

9  Binney received documents in February, 2001 relating to the Candyman E-group settings and

10  moderator, and a list of over 3,000 Candyman members. None of the records provided by

11  Yahoo made reference to e-mail delivery options for members. Shortly thereafter Binney spoke

12  with a representative of Yahoo about the documents Yahoo had delivered, and was told that the

13  other members of the Candyman E-group received the same e-mails Binney received while he

14  was a member of the E-group.

15    In March, 2001, Binney prepared a draft affidavit that was later forwarded to agents in

16  other field offices who were conducting follow-up investigations on specific targets identified

17  by Binney. Binney testified that when he prepared the affidavit it was his belief that everyone

18  who joined the Candyman E-group automatically received all the individual e-mails that he

19  received. In May, 2001, Binney was promoted to the position of supervisory special agent. As

20  a result, his case agent responsibilities in the Candyman investigation were transferred to

21  Special Agent Sheldon.  In late August, 2001, Yahoo provided Sheldon with a zip disk

22  containing logs which Yahoo represented to be a complete record of the daily functions of the

23  E-group. Sheldon testified that even if she knew then what she knows today, there was nothing

24  in the logs that would have suggested the existence of e-mail delivery options. In short, as of

25  December 28, 2001, which was the date on which Special Agent Gruninger applied for the

26  instant search warrant, the FBI had received no information regarding e-mail delivery options.

6

1    In 2002, one Cathy McGoff was a Yahoo compliance manager tasked with responding
2    to government subpoenas in the Candyman investigation. In May of that year, she learned for
3    the first time that Yahoo had historical records of Candyman members' e-mail delivery options.
4    According to Ms. McGoff, those records were turned over to the FBI in June, 2002.

5    In November, 2002, Mark Hull, the Director of Product Management for Yahoo's
6    Community Services Division, testified about e-mail delivery options before a federal grand jury
7    in St. Louis. The government and Baker stipulated to the testimony Hull would give on the
8    same subject if he were called as a witness at the *Franks* hearing in this case. His testimony
9    would be that at the time of Binney's investigation a prospective member of the Candyman E-
10   group could subscribe to the group in one of three ways. First, he could click on the "subscribe"
11   button on the front page of the E-group, which would take him to a page offering options for
12   message delivery, member profile display, and e-mail format. At the bottom of the page was
13   a "join" button. As for message delivery options, there were three: (1) the member could
14   receive at his e-mail address all individual e-mails that were posted to the site; (2) the member
15   could receive a daily digest of the e-mails posted to the site that day; or (3) the member could
16   receive no e-mails, opting instead to read the messages at the web site. Importantly, if the
17   prospective member clicked on the "join" button without selecting a message delivery option,
18   the default option was to send all e-mail messages to the member's e-mail address.

19   The second and third ways to join the Candyman E-group involved sending an e-mail.
20   One way was to send an e-mail to the "subscribe" e-mail address on the front page of the E-
21   group. If the group was open, the prospective member would be automatically signed up. The
22   other way was to send an e-mail to the E-group's moderator, whose address was also on the
23   front page of the E-group site. The moderator might or might not subscribe the prospective
24   member. A prospective member who attempted to subscribe to the Candyman E-group by
25   sending an e-mail would not be presented with message delivery options prior to becoming a
26   member.

7

1    According to Mr. Hull, the Yahoo logs for user "gobannon@usa.net," which was the e-

2    mail address Binney used during the investigation, reflect that the user "subscribed ... via web."

3    That meant that Binney must have subscribed to the Candyman E-group via the web site by

4    clicking on the "subscribe" button, not by e-mail as he had testified. In December, 2002, agents

5    with the FBI's Cyber Division conducted an in-depth review of the relevant Yahoo logs and

6    source codes, and Mr. Hull's grand jury testimony, and concluded that Mr. Hull was essentially

7    correct, *i.e.*, that Binney subscribed to the Candyman E-group by "clicking on a button on the

8    subscription web page that displays the email delivery options," and therefore, contrary to

9    Binney's testimony, "that Mr. Binney must have been presented the email delivery options."

10   *See* Court Exhibit 1, FBI Cyber Division Technical Reports.

11        At the *Franks* hearing Binney acknowledged that in the face of the logs that Yahoo

12   provided (in June, 2002), and the analysis conducted by the FBI Cyber Division (in December,

13   2002), it is likely that his recollection of joining the Candyman E-group by sending an e-mail

14   is mistaken. Binney testified that when he undertook the child pornography investigation, his

15   first objective was to find web sites that appeared to have child pornographic content. He spent

16   about an hour a day for two months screening hundreds of web sites. If the site did not appear

17   to fit investigative criteria, he moved on quickly to the next. During this preliminary search,

18   Binney was not focused on whether the site had e-mail capability. He testified that his first

19   recollection of seeing the Candyman "e-mail options page" was when an Assistant U.S.

20   Attorney showed it to him in Houston in December, 2002. Inasmuch as the evidence now

21   demonstrates that by joining the Candyman group via the web Binney must have seen the e-mail

22   options page when he joined, Ms. Koppe asked him to explain the inconsistency:

23   Q    If in fact this screen did come up while you were joining Candyman, what would

24        you have thought? What would you have done?

25   A    Well, given the testimony by Yahoo! and by the FBI technical agents -- now I'm

26        forced to kind of go back and try and figure what some possible explanations for

8

1         it may have been.  When it was first shown to me in December of 2002 it -- first

2         of all, it doesn't have a -- it doesn't require anybody to stop and do anything other

3         than hit "Join."  Yahoo! has testified that the default option is to receive e-mail.

4         That being --

5    Q     All e-mails?

6    A     All e-mails.  That being said, if I was in the mindset that I was just telling you of

7         trying to get to the content, the only thing that I can speculate is that the first thing

8         I saw was, "Send e-mail messages to geoffbinney@USA.net [sic], and I had

9         joined and went on to see the content.

10   Q     Let's go back for a moment.  It would have said, "gobannon," right, not

11        "geoffbinney"?

12   A     I'm sorry, "gobannon," yeah.

13   Q     Okay. And please continue the sentence.  I didn't mean to interrupt you.

14   A     And that's -- I mean, that's the end.  I mean, that's the only thing I could

15        speculate, is that I just went right by it and tried to get to the content.

16 Transcript of Franks Hearing, p. 33, ll. 1-25.

17      On cross-examination Binney put it this way:

18   A     I remember what I remember, and no matter what anybody shows me in the back

19        of my mind I believe that I never saw [the e-mail delivery options].  That being

20        said, it doesn't appear that there's any other reason -- that there's any other reason

21        for the testimony that Yahoo! and the FBI agents have provided.  I've testified --

22        I believe I testified here today that there's probably a 95 percent chance that I did

23        see 'em, but I don't remember seeing 'em.

24 Transcript of Franks Hearing, p. 86, l. 22 to p. 87, l.4.

25                                  **DISCUSSION**

26      In *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978), the Supreme Court held that a

9

1  defendant may challenge the validity of a search warrant whose supporting affidavit contains

2  a false statement made "knowingly and intentionally, or with reckless disregard for the truth,

3  and if the allegedly false statement is necessary to the finding of probable cause[.] ... In the

4  event that ... the allegation of perjury or reckless disregard is established by the defendant by

5  a preponderance of the evidence, and, with the affidavit's false material set to one side, the

6  affidavit's remaining content is insufficient to establish probable cause, the search warrant must

7  be voided and the fruits of the search excluded to the same extent as if probable cause was

8  lacking on the face of the affidavit." That the false statement was the product of negligence or

9  innocent mistake is insufficient. *Id.* at 171.

10      In *United States v. DeLeon*, 979 F.2d 761, 764 (9th Cir. 1992), the Ninth Circuit

11  extended the reach of a defendant's attack on the truthfulness of an affidavit supporting a search

12  warrant.

13          We agree with the *Calisto* court [*United States v. Calisto*, 838 F.2d
          711, 714 (3d Cir. 1988)] that, "[i]f we held that the conduct of ...
14          the affiant[] was the only relevant conduct for the purpose of
          applying the teachings of *Franks*, we would place the privacy
15          rights protected by that case in serious jeopardy. As the Supreme
          Court noted in *Franks*, 'police [can]not insulate one officer's
16          deliberate misstatements merely by relaying it through an officer-
          affiant personally ignorant of its falsity.' 438 U.S. at 164 n. 6, 98
17          S.Ct. at 2680." *Calisto*, 838 F.2d at 714 (footnote omitted).
          Therefore, we join the Third and Seventh Circuits in holding that
18          misstatements or omissions of government officials which are
          incorporated in an affidavit for a search warrant are grounds for a
19          *Franks* hearing, even if the official at fault is not the affiant.

20      For the reasons that follow, the court finds that in providing the false information that

21  was incorporated into the search warrant affidavit, Binney acted neither deliberately nor with

22  reckless disregard for the truth.[5] The court also finds that the affidavit would establish probable

23  cause to search Baker's home and computer even without Binney's false statements.

24  *1. Reckless Disregard*

25

26      [5] As noted above, Baker doesn't allege that Binney provided false information deliberately.

10

1    For the purpose of a *Franks* analysis, a statement is not made with reckless disregard for

2  the truth unless the affiant has a "high degree of awareness of [the] probable falsity" of the

3  statement. *United States v. Senchenko*, 133 F.3d 1153, 1158 (9th Cir. 1998). Put another way,

4  "[t]o prove reckless disregard for the truth, the defendant must prove that the affiant 'in fact

5  entertained serious doubts as to the truth' of the allegations. *United States v. Williams*, 737 F.2d

6  594, 602 (7th Cir. 1984)(internal quotations omitted)(agreeing with *United States v. Davis*, 617

7  F.2d 677, 694 (D.C. Cir. 1979)(holding that the First Amendment definition should be applied

8  by analogy in the *Franks* setting)); *see also Beard v. City of Northglenn*, 24 F.3d 110, 116 (10th

9  Cir. 1994)(same)." *United States v. Ranney*, 298 F.3d 74, 78 (1st Cir. 2002). From a time-line

10 standpoint, the focus of the court's analysis should not be on what the FBI could have learned

11 with additional investigation; it should be on what the FBI actually knew when it prepared the

12 affidavit. *United States v. Ozar*, 50 F.3d 1440, 1445-46 (8th Cir. 1995).

13    Here, the critical date is December 28, 2001, the day Agent Gruninger submitted the

14 affidavit to the magistrate judge, who in turn issued the search warrant. Given what the FBI

15 knew as of December 28, 2002, the question is whether the FBI "in fact entertained serious

16 doubts as to the truth" of Binney's representation that all members of the Candyman E-group

17 automatically received the e-mails that were posted to the web site. The court easily concludes

18 that as of December 28, 2002, neither Binney nor any of his fellow agents had any reason to

19 believe that Binney's statements were untrue.

20    Binney testified that he recalled joining the Candyman E-group by e-mail, and that in

21 doing so he was not presented with e-mail delivery options. As soon as he joined the group he

22 began receiving e-mails that had been posted to the group web site. He therefore assumed that

23 all new members also received the e-mails that were posted to the site. In view of the testimony

24 of Yahoo's Mark Hull, and the independent analysis done by the FBI Cyber Division, Binney

25 acknowledges that his recollections concerning the manner in which he joined the Candyman

26 group are inaccurate. Binney acknowledges that he must have subscribed to the group via the

1    web, and that he must have been presented with a page containing e-mail delivery options,

2    notwithstanding that he simply does not recall it that way.

3       In an effort to explain how he could have misremembered the way in which he joined

4    the Candyman group, Binney said that when he began his investigation he spent an hour a day

5    for two months hunting for investigatively suitable web sites. He would typically navigate to

6    the site's content as quickly as possible in order to determine whether the site was worthy of

7    further investigation. Until he believed that a site was an appropriate investigative target, he

8    wasn't concerned with collateral issues such as whether it had e-mail delivery options. In order

9    to uncover the site's content, it was necessary to join the group. In retrospect, Binney speculates

10    that when he clicked on the "subscribe" button on the Candyman site's front page and was

11    immediately presented with a web page containing the delivery options, he "just went right by"

12    the delivery options and clicked on the "join" button in order "to get to the content." Transcript

13    of Franks Hearing, p.33, ll. 24-25. Importantly, the evidence is clear that if no particular

14    delivery option was selected, the joining member automatically receive all e-mails by default.

15       Binney testified that he did not make notes or prepare FD-302s on the methods he used

16    to join the various E-groups or web sites that he joined. He didn't believe such information was

17    "testimonial," or otherwise material to the investigation. It might be said that Binney was less

18    than meticulous not to have done so. However, because he could not have known or anticipated

19    that his method of joining the Candyman group would become an issue in this case, Binney's

20    failure to document it was clearly not reckless. Moreover, Binney had no discernible motive

21    or reason to falsify or conceal information concerning e-mail delivery options. They were

22    simply not important to him investigatively prior to his acceptance as a member of the group.

23    It was not until June, 2002 -- six months after the issuance of the search warrant in this case --

24    that the FBI first received logs from Yahoo reflecting the existence of e-mail delivery options.

25    Nothing in the record before this court reflects that as of December 28, 2001, either Binney or

26    any other FBI agent had any degree of awareness, let alone a "high degree" of awareness, that

1  e-mail delivery options probably existed. For all of these reasons, the court finds Binney's
2  explanation credible, and further finds that the inaccurate information Binney provided was not
3  the product of a reckless disregard for the truth.

4  *2. Probable Cause*

5      To successfully challenge a search warrant affidavit that contains a false statement, a
6  defendant must demonstrate not only that the false statement was made either deliberately or
7  with reckless disregard for the truth, but also that the false statement is necessary to the finding
8  of probable cause. *Franks v. Delaware*, 438 U.S. at 155. "The ultimate inquiry is whether, after
9  putting aside erroneous information and material omissions, there remains a residue of
10 independent and lawful information sufficient to support probable cause." *United States v.*
11 *Canfield*, 212 F.3d 713, 718 (2d Cir. 2000)(internal quotations omitted).

12     In determining whether to issue a search warrant, the magistrate's task is "simply to
13 make a practical, common-sense decision whether, given all the circumstances set forth in the
14 affidavit before him ... there is a fair probability that contraband or evidence of a crime will be
15 found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). "Probable cause is a
16 fluid concept -- turning on the assessment of probabilities in particular factual contexts -- not
17 readily, or even usefully, reduced to a neat set of legal rules." *Id.* at 232. "Probable cause does
18 not require proof beyond a reasonable doubt, but only a showing of the probability of criminal
19 activity." *United States v. Daniel*, 982 F.2d 146, 151 (5th Cir. 1993).

20          Finely tuned standards such as proof beyond a reasonable doubt or
            by a preponderance of the evidence, useful in formal trials, have no
21          place in the magistrate's decision. While an effort to fix some
            general, numerically precise degree of certainty corresponding to
22          "probable cause" may not be helpful, it is clear that "only the
            probability, and not a prima facie showing, of criminal activity is
23          the standard of probable cause."

24 *Id.* at 235 (quoting *Spinelli v. United States*, 393 U.S. 410, 419 (1969)). "The fact that an
25 innocent explanation may be consistent with the facts alleged, however, does not negate
26 probable cause." *United States v. Fama*, 758 F.2d 834, 838 (2d Cir. 1985).

13

1        The court finds that the probable cause issue and factual backdrop in this case are
2   virtually identical to the probable cause issue and factual backdrop in *United States v. Froman*,
3   355 F.3d 882 (5th Cir. 2004), a case also arising out of the Candyman investigation, and where,
4   as here, the defendant lodged a *Franks* challenge to the search warrant affidavit containing the
5   same inaccurate information provided by former Agent Binney that is at issue here. The Fifth
6   Circuit held that "the affidavit was sufficient to establish probable cause even when we excise
7   the disputed material." *Id.* at 891.

8        Here, as in *Froman*, the defendant joined the Candyman group in early to mid January,
9   2001, and remained a member until the site was shut down on February 6, 2001. "The *sole*
10   purpose of the Candyman eGroup, as demonstrated by the statement in its website and the
11   activities generated on the website during the time Agent Binney was a member, was to receive
12   and distribute child pornography and erotica.  All members were given instructions for
13   cancelling membership in the group, and Froman [as well as Baker] at no time cancelled [their]
14   membership." *Id.* at 890.

15        On the Candyman website members could upload and download images of child
16   pornography. Those images were available to all the members, whether by e-mail or in the
17   "files" section. While he was a member Binney captured or received 288 images that were
18   either child pornography or child erotica.

19        Here, as in *Froman*, the defendant registered several screen names with AOL that
20   reflected his interest in child pornography.  The names Baker registered included
21   "BiggaDickaAlpha," "Mountingstick," "Lovesuckabiggy," "BeefHunLo," and "IsItTooBig4U."
22   Additionally, Gruninger's affidavit here noted that Baker worked as a teacher's aide in a day
23   care center for preschoolers.

24        On the basis of these facts, the *Froman* court found that

25             the magistrate was entitled to conclude that the overriding reason
26             someone would join this group was to permit him to receive and
              trade child pornography. We agree with the district court that it is

1          common sense that a person who voluntarily joins a group such as
         Candyman, remains a member of the group for approximately a
2          month without cancelling his subscription, and uses screen names
         that reflect his interest in child pornography, would download such
3          pornography from the website and have it in his possession.

4   *Id.* at 890-91. This court agrees. In making a "practical, common sense decision" as to whether

5   there is a "fair probability" that child pornographic materials were to be found in Baker's

6   residence or on his computer, the magistrate judge in this case was not required to exclude

7   innocent explanations for the facts presented. To be sure, it's *possible* that when Baker, a

8   twenty-two year old teacher's aide at a day care center who had used e-mail addresses such as

9   "BiggaDickaAlpha," "Mountingstick," "Lovesuckabiggy," "BeefHunLo," and "IsItTooBig4U,"

10   read that "This group is for People who love kids. You can post any type of messages you like

11   too (sic) or any type of pics and vids you like too (sic). P.S. IF WE ALL WORK TOGETHER

12   WE WILL HAVE THE BEST GROUP ON THE NET," he was inspired to join the Candyman

13   E-group because he had such a pure, universal love for children that he just wanted to look at

14   wholesome pictures or videos of other people's kids -- children who are complete strangers; or

15   it's *possible* that Baker was a talent scout looking for children who exhibited legitimate

16   commercial promise. It's *possible* that when he instead saw pornographic or other erotic images

17   of children he was so appalled that he made a note to report it to the FBI or at least quit the E-

18   group, but somehow didn't get around to it. While these scenarios are "possible," it is clear that

19   the issuing magistrate judge was entitled to draw the far more reasonable inference that Baker

20   joined Candyman in order to download images of child pornography. It is true that the search

21   warrant affidavit contained no direct evidence that Baker actually downloaded a pornographic

22   image. Proof of downloading beyond a reasonable doubt, however, is not required. All that

23   was required was a fair probability that child pornography would be found in Baker's residence.

24       *United States v. Gourde*, 382 F.3d 1003 (9th Cir. 2004), cited by Baker, is not to the

25   contrary. In *Gourde* the court observed that "[a]n affidavit establishing that it is possible, with

26   some straining, to *infer* that Gourde -- along with every other member of every site on the

1  Internet containing what appears to be child pornography -- might possess child pornography

2  is not enough to justify a warrant to search Gourde's home and seize his computer." *Id.* at 1011

3  (emphasis in original). The court expressly noted, however, that its decision is not in conflict

4  with *Froman*. In distinguishing *Froman*, the court stated:

> In *Froman*, the court upheld a search warrant where the government provided evidence that Froman was a member of a group whose "singular goal ... was to collect and distribute child pornography and sexually explicit images of children," *id.* At 884; members of the group could choose to automatically receive emails with attached images, *id.* at 890; and the affidavit contained personalized evidence regarding Froman's interest in child pornography by way of his chosen screen names, "Littlebuttsue" and "Littletitgirly," *id.* at 891. None of these facts bearing on Froman's actual possession of child pornography is present here.

11  *United States v. Gourde*, 382 F.3d at 1012. All of those facts bearing on Baker's actual

12  possession of child pornography are present here.

13  *3. Staleness*

14  An affidavit must be based on facts "'so closely related to the time of the issue of the

15  warrant as to justify a finding of probable cause at that time.'" *Durham v. United States*, 403

16  F.2d 190, 193 (9th Cir.1968) (quoting *Sgro v. United States*, 287 U.S. 206 (1932)). "The mere

17  lapse of substantial amounts of time," however, "is not controlling in a question of staleness."

18  *United States v. Dozier*, 844 F.2d 701, 707 (9th Cir.1988). "We evaluate staleness in light of

19  the particular facts of the case and the nature of the criminal activity and property sought."

20  *United States v. Pitts*, 6 F.3d 1366, 1369 (9th Cir.1993)(internal quotation omitted).

> [P]robable cause is not determined simply by counting the number of days between the facts relied on and the issuance of the warrant. Rather, whether information is too stale to establish probable cause depends on the nature of the criminal activity, the length of the activity, and the nature of the property to be seized. Thus, where the property sought is likely to remain in one place for a long time, probable cause may be found even though there was a substantial delay between the occurrence of the event relied on and the issuance of the warrant.

26  *United States v. Shomo*, 786 F.2d 981, 984 (10th Cir. 1986). *See also United States v. Foster*, 711 F.2d

871, 878-79 (9th Cir. 1983). "The information offered in support of the application for a search warrant is not stale if there is sufficient basis to believe, based on a continuing pattern or other good reasons, that the items to be seized are still on the premises." *United States v. Lacy*, 119 F.3d 742, 745-46 (9th Cir. 1997)(internal quote omitted)(ten month delay in child pornography case not stale where nature of crime provides good reason to believe downloaded computerized visual depictions would be present in defendant's apartment).

Although Baker could have unsubscribed from the Candyman Egroup at any time, he remained a member of the Egroup until it was shut down on February 6, 2001. The primary feature of the web site was the "Files" section, which enabled members to upload and download images directly to the web site. As noted above, in addition to Carvaggio, Baker used several other screen names unsubtly suggestive of a strong interest in pornography. Based on the search warrant affidavit a fair inference can be drawn that Baker received hundreds of e-mails during the three-week period of his membership, the substantial majority of which contained images of child erotica and child pornography. Given the facts and circumstances set forth in the affidavit here at issue, the issuing magistrate judge correctly found that there was a fair probability that images of child pornography would still be found in Baker's residence.[6]

## RECOMMENDATION

Based on the foregoing, it is the recommendation of the undersigned United States Magistrate Judge that Baker's Motion to Suppress Physical Evidence (#23) should be denied.

DATED this 14th day of October, 2005.

**LAWRENCE R. LEAVITT**
**UNITED STATES MAGISTRATE JUDGE**

---

[6] Assuming arguendo that the information in the affidavit were impermissibly stale, the warrant was clearly not so facially lacking in probable cause as to preclude the executing agents' good faith reliance on it. *See United States v. Leon*, 468 U.S. 897, 922-23 (1984).

17